1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                   FOR THE DISTRICT OF OREGON

11  BANCARD SERVICES, INC., a    )
    Montana corporation; and CASH    )
12  RESOURCES, INC., a Colorado  )
    corporation,                 )    No. CV-01-1741-HU
13                               )
                  Plaintiffs,    )
14                               )
          v.                     )
15                               )    FINDINGS & RECOMMENDATION
    E*TRADE ACCESS, INC., an      )    REGARDING JUSTICIABILITY
16  Oregon corporation,          )    AND STANDING
                                 )
17                Defendant.     )
    _____)

18

    F. Gordon Allen
19  ALLEN & O'HALLORAN
    1300 S.W. Fifth Avenue, Suite 2750
20  Portland, Oregon 97201-5617

21       Attorney for Plaintiffs

22  Donald E. Templeton
    Elizabeth C. Knight
23  DUNN CARNEY ALLEN HIGGINS & TONGUE
    851 S.W. Sixth Avenue, Suite 1500
24  Portland, Oregon 97204-1357

25       Attorneys for Defendant

26  HUBEL, Magistrate Judge:

27       Plaintiffs Bancard Services, Inc. and Cash Resources, Inc.,

28

    1 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
          STANDING

bring this declaratory relief action against defendant E*Trade Access, Inc. Defendant brings counterclaims against plaintiffs. Both parties previously moved for summary judgment. In a November 4, 2002 Findings & Recommendation, I recommended that plaintiffs' motion be granted in part and that defendant's motion be denied.

Plaintiffs and defendant both filed objections to the Findings & Recommendation which was referred to Judge Marsh for review on December 9, 2002. In a January 10, 2003 Opinion & Order, Judge Marsh declined to review the merits of the summary judgment motions and remanded the case back to me to address the issues of justiciability and standing. Following Judge Marsh's Opinion & Order, the parties submitted additional briefing. This Findings & Recommendation is issued to address Judge Marsh's Opinion & Order.

Much of the background is recited in the November 4, 2002 Findings & Recommendation and will not be repeated here. Additional relevant background will be incorporated into the discussion.

DISCUSSION

I. Justiciability

Shortly after plaintiffs filed the Complaint, defendant moved to dismiss the action on the basis that plaintiffs had failed to present a justiciable controversy. Plaintiffs responded to the motion. Defendant failed to file a reply in support of the motion and then withdrew the motion.

Following the withdrawal of the motion, defendant filed its

2 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

Answer which included the assertion of three counterclaims against plaintiffs. First, defendant counterclaimed for declaratory relief that the renewal provisions in the Site Location Agreements are valid and enforceable. Answer at ¶¶ 9, 10. Second, defendant sought an injunction enjoining plaintiffs from contacting, soliciting, or interfering with defendant's customers. Id. at ¶ 13. In support of the injunctive relief claim, defendant alleges that plaintiffs have solicited defendant's customers in an attempt to persuade them to breach their contracts with defendant and switch their business to plaintiffs. Id. at ¶ 12. Defendant alleges that in some cases, plaintiffs have succeeded and the customers have actually breached their contracts with defendant, stopped doing business with defendant, and started doing business with one or both plaintiffs. Id. Finally, defendant counterclaimed for damages for plaintiffs' interference with defendant's contracts with its customers. Id. at ¶ 14.

In the summary judgment materials, the parties represented that the issue of justiciability was admitted. Nonetheless, as Judge Marsh noted in his January 10, 2003 Opinion & Order, parties cannot stipulate to jurisdiction. Richardson v. United States, 943 F.2d 1107, 1113 (9th Cir. 1991). Having now considered the issue, for the reasons explained below, I conclude that there is a justiciable controversy presented by the claims and the counterclaims in this case.

Federal courts may act only in cases and controversies. U.S. Const. art III, § 2. Similarly, the Declaratory Judgment

3 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

Act applies only in "a case of actual controversy." 28 U.S.C. § 2201. "A lawsuit seeking federal declaratory relief must first present an actual case or controversy within the meaning of Article III, section 2 of the United States Constitution." Government Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1222 (9th Cir. 1998).

Declaratory judgment actions must present a "real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941). Article III requires that there be a "substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id.

"That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action." Associated Indemn. Corp. v. Fairchild Indus., Inc., 961 F.2d 32, 35 (2d Cir. 1992). "The practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists." GTE Directories Pub'g Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1569 (11th Cir. 1995) (internal quotation omitted).

Both parties cite a 1970 District of Colorado case in which the plaintiff brought an action under the Declaratory Judgment

4 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

Act regarding the validity of noncompetition clauses in contracts that the plaintiff had with the defendant. <u>Bruhn v. STP Corp.</u>, 312 F. Supp. 903 (D. Col. 1970). The court stated that disputes involving covenants restricting competition and statutory protection against competition, such as under patent laws, may be placed in one of three general categories for the purpose of determining whether the requirement of ripeness is met. <u>Id.</u>    The court explained:

> The first category consists of those disputes where the alleged liability creating act has already occurred. This would be the case, for example, where the plaintiff has already engaged in a business violative of a covenant not to compete or has produced and/or marketed a product which assertedly infringed upon an existing patent. Absent declaratory relief the party who allegedly breached the covenant not to compete or infringed the patent would be required to wait until the adverse party brought suit before he could secure a judicial determination of the propriety of his conduct. One of the main purposes of the Declaratory Judgment Act was to allow a party to bring an action asserting his 'nonliability' in such a situation.

<u>Id.</u> at 905-06.

> The court continued:

> The federal courts have viewed the Declaratory Judgment Act as remedial and have given it a liberal interpretation in order to carry out its purpose. They have, therefore, normally granted declaratory relief in a second category of disputes -- where an immediate controversy exists even though the act which will allegedly create liability has not as yet occurred. Such a situation arises where one or both parties have taken steps or pursued a course of conduct which will result in "imminent" and "inevitable" litigation, provided the issue is not settled and stabilized by a tranquilizing declaration.

<u>Id.</u> at 906.

> Finally, the

5 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

third category [] includes those disputes which are not yet ripe for adjudication. The act which would allegedly result in liability -- plaintiffs' acceptance of employment in violation of the covenant-- has not yet occurred. Also, none of the parties have taken steps or pursued a course of conduct which will necessarily lead to litigation in the immediate future.

Id.

In Bruhn, the court found that the dispute in that case fell into the third category because none of the parties had taken steps or pursued a course of conduct which would necessarily lead to litigation in the immediate future. Id. The court noted that the plaintiffs had not alleged that they had sought employment or begun preparations to sell or distribute products competitive to defendant. Id. The plaintiffs had not alleged that defendant had threatened suit. Id. Answers to interrogatories indicated that the plaintiffs wished to sell or distribute products competitive to the defendant, but that none of them had any associates or business organizations with whom they planned to carry out such activities. Id. The court concluded that it was "clear that plaintiffs are merely apprehensive, but have not nevertheless even begun to pursue a course of action which would lead them down the path of litigation." Id.

The facts here are distinguishable from those in Bruhn and demonstrate that this case falls into either the first or second category of disputes as outlined by the Bruhn court. As a result, the claims here are justiciable.

The evidence in the record shows that plaintiffs and

6 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

defendant are competitors.  Tom Durrant Declr. at ¶ 10.  In the past, defendant had a contract with a truck stop in Idaho Falls, referred to as "Wright Brothers."  Id. at ¶ 15.  After the initial five-year term, Wright Brothers terminated the agreement on July 24, 2000.  Id. at ¶ 16; Exh. 2 to Durrant Declr.  Wright Brothers then entered into an agreement with Bancard Services to provide processing for the ATM machine.  Id. at ¶ 17. Defendant, however, claims commissions for the period of time that Bancard Services has had the contract with Wright Brothers. Id. at ¶ 18.

Defendant uses a national collection agency named Newton & Associates, to collect on what defendant insists is the debt owing to it.  Id.  Newton sent a letter dated August 7, 2001, to Wright Brothers, seeking $27,720 allegedly owed to defendant. Id.; Exh. 4 to Durrant Declr.  The letter states that if settlement is not made within three days, Newton/defendant will "immediately proceed with all legal remedies available."  Exh. 4 to Durrant Declr.

In an August 21, 2001 letter from Newton, Newton told Wright Brothers that if Wright Brothers agreed to a new contract with defendant, defendant would waive the $27,720 in alleged indebtedness.  Durrant Declr. at ¶ 20.  Apparently, Wright Brothers rejected this offer.  Id.

Internal communications from Newton employee Marcus Anthony to Newton collector John Mitchell show that Newton/defendant believed there were three options for an "amicable resolution" of the dispute with Wright Brothers:  1) Bancard Services buys

7 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
    STANDING

out the contract at the valued amount shown; 2) Wright Brothers
reinstates services with defendant, who will then waive any lost
revenue between July 2000 and the present; or 3) Wright Brothers
pays the value of the remaining contract.  <u>Id.</u>  Anthony further
states that if an amicable resolution could not be reached,
there would be no option remaining other than litigation.  <u>Id.</u>

Newton sent Wright Brothers another collection letter on
October 9, 2001.  <u>Id.</u> at ¶ 23; Exh. 8 to Durrant Affid.  On
October 18, 2001, Bancard Services entered into an agreement
with Wright Brothers to indemnify Wright Brothers from any
claims made against it by defendant.  <u>Id.</u> at ¶ 24; Exh. 10 to
Durrant Affid.  Bancard then filed this action on December 4,
2001.

Dan Willie also was a party to contracts with defendant.
<u>Id.</u> at ¶ 25.  He wanted to switch companies and terminated his
contracts with defendant at the five-year anniversary date.  <u>Id.</u>
at  ¶ 26; Exh. 10 to Durrant Declr. (March 19, 2001 letter
regarding Flags West Truck Stop).  Defendant responded to
Willie's termination letter by attaching a copy of the
applicable contract and circling paragraphs twelve and fifteen.
Exh. 11 to Durrant Declr.  Newton, on behalf of defendant,
continues to send collection letters to Willie's company seeking
payment of $10,577.40 allegedly owed to defendant.

Similarly, Mike Hunziker was also a party to contracts with
defendant.  Durrant Declr. at ¶ 30.  He terminated those
contracts at the five-year anniversary and presently uses
Bancard Services to service his locations.  <u>Id.</u> at ¶ 31.  Newton

8 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
    STANDING

1  is now sending collection notices to Hunziker seeking $9,441
2  allegedly owed to defendant. _Id._

3      Finally, Jim Hansen also terminated his contract with
4  defendant in favor of a contract with Bancard Services. _Id._ at
5  ¶ 33. Defendant threatened him with legal action for breaching
6  the agreement Hansen had with defendant. _Id._ at ¶ 35; Exh. 14
7  to Durrant Declr. Later, Newton sent a collection letter to
8  Hansen stating that if a new contract with defendant were
9  signed, defendant would forgive all outstanding charges. Exh.
10 15 to Durrant Declr. The letter further states that if a new
11 contract is not signed, it would pursue unpaid charges of
12 $2,376, plus $17,820 of the remaining contracted balance. _Id._
13
14     Hansen requested that Bancard Services solve the problem
15 within thirty days. Durrant Declr. at ¶ 36. Because Bancard
16 Services could not do so, Hansen returned servicing back to
17 defendant. _Id._
18     As the cases cited above make clear, the controversy between
19 the parties must be real and substantial, not hypothetical or
20 abstract. A contingent liability suffices, if there is a reason
21 to believe that contingencies will occur and the dispute is
22 real. Here, the fact that the controversy is not between
23 defendant and those parties with whom it has or had contracts is
24 not fatal.
25     The evidence shows that defendant is threatening litigation
26 against several of its former customers who have terminated
27 their Site Location Agreements at the expiration of the first
28
   9 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
       STANDING

five-year period.  Whether the litigation initiated by defendant
is in the nature of collection on a debt or a breach of contract
claim, the former customers will most certainly defend the
action by arguing that the renewal provision under which
defendant bases its claim, is void.    Thus, an immediate
controversy exists and defendant's collection efforts and
threats of litigation amount to pursuit of a course of conduct
which will likely result in litigation unless the validity of
the contractual renewal provision is adjudicated here.

Notably, in at least one instance, Bancard Services has
agreed to indemnify defendant's former customer as to any claims
brought against it by defendant.  Because <u>Bruhn</u> addressed the
justiciability issue in the context of contractual non-compete
clauses, the plaintiff and the defendant in that case were both
parties to the contract.  Here, in contrast to <u>Bruhn</u>, there will
never be a contract between plaintiffs and defendant because
they are competitors in the marketplace.  However, the fact that
plaintiffs and defendant here are not parties to the contract in
dispute is not inconsistent with a finding that this is a
justiciable controversy.

As a result of the indemnity agreement between Bancard
Services and one of defendant's customers, there is a direct
relationship between Bancard Services and defendant because
Bancard Services is now financially liable for any unlawful
breach by the customer of the customer's contract with
defendant.  Thus, plaintiffs' interest in the litigation is more
than abstract.  The indemnity agreement makes the declaratory

10 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
     STANDING

1  judgment claims definite and concrete.

2      Furthermore, defendant counterclaims for damages and
3  injunctive relief arising out of plaintiffs' alleged
4  interference with the contracts between defendant and its
5  customers.   These claims are clearly justiciable in that
6  defendant alleges that plaintiffs' past actions have already
7  caused damage.  In fact, it is likely that some of the customers
8  who have been the target of the alleged interference by
9  plaintiffs are the ones plaintiffs have agreed to indemnify in
10 any action brought against them by defendant.

11     Given the threatened litigation by defendant against its
12 customers, the heart of which will be the validity of the
13 renewal provision, given the fact that plaintiffs have agreed to
14 indemnify at least one of defendant's former customers, and
15 given the presence of defendant's counterclaims for injunctive
16 relief and damages allegedly caused by plaintiffs' tortious
17 interference with the contracts between defendant and its
18 customers, the controversy between plaintiffs and defendant is
19 justiciable because it is neither hypothetical nor abstract, and
20 is instead, real and substantial.

21 II.  Standing

22     Judge Marsh was concerned that plaintiffs, "as neither
23 parties nor third-party beneficiaries to the agreements at
24 issue," lack standing to pursue their claims.  Jan. 10, 2003
25 Opinion & Order at p. 2.  Standing, like justiciability, derives
26 from the Article III requirement that federal courts hear only
27 live cases and controversies.  PLANS, Inc. v. Sacramento Unified

28

11 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
       STANDING

Sch. Dist., 319 F.3d 504, 507 (9th Cir. 2003).  Standing embodies the concept that there be a personal interest in the litigation.  Oregon Advocacy Center v. Mink, No. 02-35530, 2003 WL 751319, at *12 (9th Cir. Mar. 6, 2003); see also Hall v. Norton, 266 F.3d 969, 975 (9th Cir. 2001) ("[t]he standing inquiry focuses upon '[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy[.]'") (quoting Sierra Club v. Morton, 405 U.S. 727, 731 (1972)).

There are three constitutional standing requirements: (1) the plaintiff must have directly suffered an "injury in fact," (2) the injury must be fairly traceable to the defendant's conduct, and (3) a favorable court decision must be likely to redress the injury.  Rubin v. City of Santa Monica, 308 F.3d 1008, 1019 (9th Cir. 2002).

In addition, courts have developed several "prudential" standing requirements including "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  Allen v. Wright, 468 U.S. 737, 751 (1984).  The prudential component of standing precludes the exercise of federal jurisdiction even where the Constitution's "irreducible minimum" requirements have been met.  Oregon Advocacy Center, 2003 WL 751319, at *4.

A.  Constitutional Requirements

12 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND STANDING

"Injury in fact" may be met by the assertion of an imminent competitive injury. In _Viceroy Gold Corporation v. Aubry_, 75 F.3d 482 (9th Cir. 1996), the plaintiff sued California labor officials for declaratory and injunctive relief, arguing that California statutes permitting only unionized mining workers to work more than eight-hour days was preempted by federal law. The plaintiff operated a non-union mine. The plaintiff's employees, most of whom lived seventy-five or more miles from the operation, requested a change in hours so that they could work twelve, rather than eight, hours a day, but fewer days per week. California law generally prohibited mine workers from working more than eight hours in a twenty-four hour period, but an exception allowed employees subject to a collective bargaining agreement to craft a different arrangement for the number of hours worked in a day.

The defendants argued that the plaintiff lacked standing to bring its claims. Both the district court and the Ninth Circuit rejected the defendants' argument. The court explained that the "competitive disadvantage [the plaintiff] suffers relative to unionized mines and the pressure to unionize, is an injury in fact." _Id._ at 488.

The _Viceroy Gold_ court cited a lower court decision for support. _Associated Builders & Contractors, Golden Gate Chapter, Inc. v. Baca_, 769 F. Supp. 1537 (N.D. Cal. 1991), _aff'd_, 64 F.3d 497 (9th Cir. 1995). There, a builders' association and the Chamber of Commerce of the United States challenged local government resolutions requiring payment of

13 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
     STANDING

"prevailing wages" to construction employees before issuance of building permits for private construction projects. The defendants argued that the plaintiffs lacked standing because no specific showing of injury had been made and the economic consequences on the association's members was uncertain.

The court concluded that the plaintiffs had standing because the resolutions "directly affect contractors, such as [the association's] members, who do not now pay the prevailing wage rates." Id. at 1542. The court noted that the "economic consequences to [the association's] members, both in terms of increased direct costs and reduced competitiveness within the construction industry, satisfies the injury-in-fact requirement." Id.

In an earlier case, the Ninth Circuit noted that competitive injuries "have often been recognized as grounds for standing." Bullfrog Filmes, Inc. v. Wick, 847 F.2d 502, 506 (9th Cir. 1988). There, independent film makers, film production and distribution companies, and a membership organization, brought claims alleging the unconstitutionality of certain regulations adopted by the United States Information Agency (USIA) which implemented the "Beirut Agreement," a multilateral treaty aimed at facilitating the international circulation of educational, scientific, and cultural audio-visual materials. Under the treaty, qualifying materials receive certain benefits, including exemption from import duties. A certificate of international character is required to receive treaty benefits.

14 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
       STANDING

Under the rules adopted by the USIA, several of the plaintiffs' films were denied a certificate of international character.  As a result, the plaintiffs had to pay customs duties to export to Canada four of their files.  The court held that this pecuniary injury satisfied the "injury in fact" prong of the standing analysis.  Id. at 506.  The court went on, however, to note that even without having incurred the customs duties, the plaintiffs showed "injury in fact" by alleging that the denial of benefits under the Beirut Agreement put "their files at a competitive disadvantage in the international marketplace, resulting in the loss of sales."  Id.  The court further explained that because it was undisputed that a certificate of international character was an "'indispensable prerequisite' to the realization of benefits under the [Beirut] Agreement[,]" the denial of the USIA certification worked a "cognizable injury" to the plaintiffs' "ability to compete for benefits under the [Beirut] Agreement."  Id.  Such a competitive injury sufficed for standing.

In another case, the First Circuit recognized the premise that a plaintiff's status "as a direct competitor whose position in the relevant marketplace would be affected adversely by [] challenged governmental action[]" met the "injury in fact" requirement for constitutional standing.  Adams v. Watson, 10 F.3d 915, 922 (1st Cir. 1993).

The Third Circuit accorded standing to a plaintiff in such a situation.  UPS Worldwide Forwarding, Inc. v. United States Postal Serv., 66 F.3d 621, 626 (3d Cir. 1995).  There, the

15 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
      STANDING

plaintiff brought suit alleging that a new "International
Customized Mail" (ICM) service offered by the defendant,
involving negotiated, individual agreements with customers
capable of tendering large quantities of international mail,
violated the Postal Reorganization Act.

The defendant argued that the plaintiff lacked standing, but
the court rejected the argument.  The court explained that

> there is no dispute that UPS meets the constitutional
> standing requirements.  First, as a competitor of the
> Postal Service with authority to compete in the
> international parcel delivery market, . . . UPS stands
> to lose clientele lured to the Postal Service by the
> ICM service.  Although UPS may not have demonstrated
> any lost business yet, the "injury in fact" component
> of standing merely requires that such injury be
> "imminent."

Id. (footnote omitted).

Based on the authority of these cases, I conclude that
plaintiffs meet the "injury in fact" constitutional standing
requirement.  As noted above, plaintiffs and defendant are
competitors in the relevant ATM transaction processing industry.
Because defendant's contracts with various locations contain,
according to defendant, a valid perpetual renewal provision,
plaintiffs are prevented from competing in the industry.  Thus,
plaintiffs suffer a competitive injury.

The injury is more than imminent because, in at least one
instance, a customer of defendant's who switched to service with
plaintiffs, returned to a contract with defendant upon threat of
litigation by defendant, depriving plaintiffs of that customer's
business.  Additionally, as noted above, plaintiffs have now
agreed to indemnify at least one of defendant's former customers

16 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
     STANDING

against any action brought against that customer by defendant, in order to keep that customer.  Thus, plaintiffs establish an imminent competitive injury sufficient to show "injury in fact."

Next, there is a "fairly traceable causal connection" between plaintiffs' injury and the challenged conduct.  The connection is demonstrated by the contested perpetual renewal and exclusive dealing provisions of the Site Location Agreements which defendant continues to assert as the basis for its threats against former customers who now do business with plaintiffs. The conduct of defendant that is challenged has already resulted in plaintiff agreeing to indemnify a customer defendant allegedly continues to threaten with litigation.  Conversely, plaintiff's conduct is the alleged cause of defendant's damages sought in its counterclaim.

Finally, there is a substantial likelihood that the relief requested will redress or prevent the injury because should the challenged provisions of the Site Location Agreements be found invalid, defendant will be unable to enforce those provisions against its customers or against plaintiffs in its tortious interference claim.  Likewise, the damages defendant seeks in its counterclaim are the only sort of remedy available to redress defendant's alleged injury.

B.  Prudential Requirements

Here, because plaintiffs are actually attempting to compete and that competition is being stifled by an allegedly illegal contract, plaintiffs assert their own rights and do not rest their claims on the legal rights or interests of third parties.

17 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
     STANDING

1  See UPS Worldwide Forwarding, 66 F.3d at 627-28 (finding
2  prudential requirement of asserting own injury satisfied because
3  ICM service, if permitted under the Postal Reorganization Act,
4  would injure plaintiff even though other persons such as
5  mailers, may also suffer injury).  Furthermore, with plaintiffs
6  agreeing to indemnify Wright Brothers, plaintiffs insert their
7  own obligations and rights into the relationship between
8  defendant and its customers.
9       Next, the injury alleged by plaintiffs is not shared in
10 substantially equal measure by all or a large class of citizens.
11 Finally, to the extent the "zone of interest" prong plays a role
12 in a case not involving a constitutional challenge to a statute,
13 I conclude that plaintiffs' interest is arguably within the zone
14 of interests regulated by the contract at issue.  The effect of
15 the challenged provisions in the Site Location Agreements is to
16 "regulate" the ATM processing industry by perpetually "locking
17 up" locations and preventing other entities from competing for
18 this business.  The combined effect of the perpetual renewal and
19 non-competition agreements (along with the tort of intentional
20 interference of contract) perpetually eliminates plaintiffs from
21 the marketplace.  Thus, while the Site Location Agreements
22 directly regulate the relationship between defendant and its
23 customers, the Agreements indirectly target the potential
24 relationship between the locations and third-party competitors
25 such as plaintiffs.  This is sufficient to satisfy the
26 prudential standing concerns.
27                          CONCLUSION
28
18 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
     STANDING

I conclude that the claims at issue in this case present a justiciable controversy and that plaintiffs have standing to pursue the action.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due April 14, 2003.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.    If objections are filed, a response to the objections is due  April 28, 2003, and the review of the Findings and Recommendation will go under advisement on that date.

DATED this <u>28th</u>   day of <u>March</u>, 2003.

<u>Dennis James Hubel</u>

Dennis James Hubel
United States Magistrate Judge

19 - FINDINGS & RECOMMENDATION REGARDING JUSTICIABILITY AND
      STANDING